IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA

v.

JOSEPH H. CRAFT

Criminal No. 2:21-cr-45

**SENTENCING MEMORANDUM**

The defendant, Joseph H. Craft, through undersigned counsel, submits this Sentencing Memorandum to address the factors to be considered in imposing sentence under 18 U.S.C. § 3553(a).

1. **The crime and the person.**

   **A. The nature and circumstances of the offense.**

   The description of the instant offense is succinctly and aptly described by the United States Probation Offense. *See* ECF 32, ¶¶10-11. A brief word is due, however.

   On May 30, 2020, Mr. Craft was one of thousands in Pittsburgh—and millions nationwide—protesting the murder of George Floyd. It shouldn't be overlooked that what brought him to the streets of Pittsburgh that day was the same thing that drew thousands of others there: a collective sense of injustice.

To understand Mr. Craft's actions that underlay his offense conduct, it's important to understand group psychology. "[W]hat can begin as a peaceful protest can rapidly devolve into riots due to group polarization. Group polarization is the tendency of people to make decision that are more extreme when they are in a group setting as opposed to a decision made alone or independently. This is enhanced by the anonymity factor or deindividuation. This is a concept inherent in groups in which there is a diminishing understanding of one's sense of individuality. [A]n individual's perception of self will decrease making a person more willing to engage in antisocial or violent behavior because they believe they are protected by the group." Yasmine Ghattas, *The Psychology Behind Riots: What the riots and uninformed forces have in common*, Medium.com (June 3, 2020), https://medium.com/illumination/the-psychology-behind-riots-4b01530a83f8.[1]

---

[1] *See also* Benedict Carey, *Making Sense of the 'Mob' Mentality: Why do some mass gatherings turn violent? Experts in crowd behavior say there's still much to learn*, NYTimes.com (Jan. 21, 2021), https://www.nytimes.com/2021/01/12/science/crowds-mob-psychology.html (quoting French intellectual and writer, Le Bon, who built a theory of crowd behavior as saying: "An agglomeration of men presents new characteristics very different from those of the individuals composing it. The sentiments and ideas of all the persons in the gathering take one and the same direction, and their conscious personality vanishes. A collective mind is formed.")

A proper perspective of Mr. Craft's relevant conduct must account for this frame of reference.

**B. The history and characteristics of Mr. Craft.[2]**

Certainly, an understanding of Mr. Craft apart from his actions on May 30, 2020, is critical to the process of individualized sentencing. Mr. Craft is more than the sum of his actions that one day.

"Joe is a great man who has lots to bring into this life and the lives of others," his employer says. *See* Letter of Reference, D. Colin Adamek, attached as **Exhibit A.** He is described as "hardworking," "reliable," and "not only intelligent and driven but also very kind." *Id.*[3]

There's much that Mr. Craft, 29, has to offer in this life, and since his suicide attempt of 2008, at the age of 16, *see* ECF 32, ¶40, he's discovering that fact. Indeed, his employer notes he's "a vital piece of the business" without whom the business would "suffer" and regress in

---

[2] Four letters of reference speaking to Mr. Craft's character, marked as **Exhibits A, B, C, and D,** are submitted along with this Sentencing Memorandum.

[3] Throughout 2018 to 2020, Mr. Craft originated, organized, and hosted multiple art galas that raised money to benefit local and international non-profits such as Pittsburgh Action Against Rape (PAAR), Sisters PGH, and the Rainforest Trust. Mr. Craft continues to participate in community art initiatives that give back to the community, and by his participation has raised thousands of dollars to benefit marginalized communities. *See* Letter of Reference, Matthew Williams, attached as **Exhibit B.**

in these uncertain times without his assistance.  *See* **Exhibit A.**  Mr. Craft, though, is nevertheless a work in progress like the art that he creates.  *Id.* at ¶45.

Notably, Mr. Craft hasn't allowed himself to be shaped by his past, but he's constantly growing and improving.  Mr. Craft may have grown up struggling financially, *see Id.* at ¶35, but his work history demonstrates a persistence to advance and better his lot in life with each new role.  From 2011 to 2015, he's gone from working $9/hour jobs at Goodwill and in the food-service industry; to, in 2017 to 2019, making $15/hour then $200 per day (or $25/hour) as a painter; to his current role, managing SoFresh at $20/hour.  *Id.* at ¶¶47-55.

At the age of 8, Mr. Craft may have witnessed his father's battle with alcoholism and struggled himself with substance abuse at the age of 15. *Id.* at ¶35, 42.  But like his father, Mr. Craft has made marked efforts at sobriety and taken initiative to improve his mental health and well-being. *Id.* at ¶35, 40-41.  His course is one of persistent self-improvement.  What better example of that fact than Mr. Craft's acknowledgment of his academic deficits and struggles with ADHD to go on all the same to receive his high-school diploma and further better

himself by completing a masonry program and learning the construction trades from his father and grandfather. *Id.* at ¶¶36, 44

All told, Mr. Craft keeps fighting through the hands he's dealt in life, and with each new stage of life he's growing and finding direction. Supervision is conducive to that growth; however, imprisonment is not.

## 2. The *need* for the sentence imposed.

On the point for this Court to consider about "the *need* for the sentence imposed to reflect the seriousness of the offense," *see* 18 U.S.C. § 3553(a)(2)(A), Mr. Craft would note only this: the offense of conviction itself—a felony—is sufficiently serious on its own, both in name and effect. *See Folajtar v. Attorney Gen. of the U.S.*, 980 F.3d 897, 904-05 (3d Cir. 2020) (confirming history's stance on felonies as "the most serious category of crimes" and that, today, "felonies continue[] to reflect the category of serious crimes committed by those outside the virtuous citizenry").

Those who bear the moniker "felon"—and those who don't—know well the costs a felony exacts for the remainder of a lifetime. It means reputational harm, disenfranchisement, loss of important rights and civil privileges, and perpetual impediments to upward economic

mobility. *See Smith v. President of U.S.*, 2009 WL 2591624, *2 (E.D. Wis. Aug. 21, 2009) (highlighting "well-recognized collateral consequences of a felony conviction" as loss of the right to carry a firearm and to vote and hold public office); *see also Parker v. Ellis*, 362 U.S. 574, 593–94 (1960) (Warren, C.J., dissenting) ("Conviction of a felony imposes a status upon a person which not only makes him vulnerable to future sanctions through new civil disability statutes, but which also seriously affects his reputation and economic opportunities.")

Often, little more is needed than the branding of that title to one's name for the remainder of their life to reflect the seriousness of the offense. No term of months—whether 1, 4, or 10—will be *needed* to further reflect the seriousness of the offense of conviction. Mr. Craft, and indeed the public at large, is sufficiently apprised of the seriousness of the conduct at hand.

To the point of deterrence, and the need of the sentence to afford adequate deterrence to criminal conduct, the Government may posit that Mr. Craft's forthcoming sentence may deter the general public, but Mr. Craft is of a different mind. "Research shows clearly that the chance of being caught is a vastly more effective deterrent than even

6

draconian punishment." *See Five Things About Deterrence,* National Institute of Justice (June 5, 2016), https://nij.ojp.gov/topics/articles/five-things-about-deterrence#addenda. "Prisons are good for punishing criminals and keeping them off the street, but prison sentences (particularly long sentences) are unlikely to deter future crime." *Id.* A sentence of imprisonment, therefore, is not *needed* to deter, nor to reinforce the seriousness of the offense.

### 3. The kinds of sentences available.

Mr. Craft agrees with the USPO as to the kinds of sentences available—probation, intermittent confinement, community confinement, and home detention. See ECF 32, at ¶60.

### 4. The established advisory guideline range: "The applicable category of offense[4] committed by the applicable category of defendant."

For the offense of conviction, the offense level is 8, and Mr. Craft's criminal history category is II. *See* ECF 32 at ¶¶25, 29. The advisory guideline range is 4 to 10 months' imprisonment. *Id.* at ¶59.

### 5. Pertinent policy statements.

---

[4] "'Applicable category of offense' is simply an imprecise way of saying the applicable guideline range, *i.e.,* the sentencing range that corresponds to the adjusted offense level." *See United States v. Crosby*, 397 F.3d 103, 112 n.10 (2d Cir. 2005), *abrogated on other grounds by United States v. Fagans,* 406 F.3d 138 (2d Cir. 2005).

7

> U.S.S.G. § 5H1.5 is a pertinent policy statement.
>
> Employment record may be relevant in determining the conditions of probation or supervised release (e.g., the appropriate hours of home detention).

**6. The *need* to avoid unwarranted sentence disparities.**

On January 27, 2021, another similarly situated defendant in the Western District of Pennsylvania, Brian Bartels, was sentenced before this very Court to one day of imprisonment followed by three years of supervised release, including 180 days in a residential reentry center, for the same offense of conviction as Mr. Craft's. *See, e.g., United States v. Bartels,* 21-cr-116, ECF 55. Mr. Bartel's Criminal History Category was I, *id.*, ECF 53, at 5, and his adjusted offense level was the same (8). Mr. Bartel's offense conduct was described as follows by his counsel in his Sentencing Memorandum:

> Brian's actions, in kicking in the windshield of a police vehicle and then spray painting the vehicle, resulted in that vehicle being taken out of commission. Further, **his actions likely invigorated several other[s] in the crowd who soon escalated the destruction.** The escalation, which occurred rapidly and unexpectedly, led to the closure of several businesses.

*Id.*, ECF 47, at 2 (emphasis added).

By comparison, Mr. Craft also partook in destructive acts on police vehicles—*i.e.* hitting a police cruiser's windows, twice, with his skateboard as it drove by and breaking out the window of a nearby, unoccupied cruiser already under assault by other protesters, *see* ECF 32, ¶11—but his acts were never the spark to further destruction or escalation. He was a follower, not an instigator. He got caught up in conduct that he otherwise wouldn't have engaged in if alone.

Admittedly, in contrast to Mr. Bartels, Mr. Craft accepted responsibility for picking up at least two pepper-spray cans and throwing them back toward the police; however, there's never been any indication or proof that that conduct hurt law enforcement, or was aimed at impairing them, as much as it was meant to aid fellow protesters by "snuffing out smoke." *Id.* at ¶11. Certainly, Mr. Craft was carrying around large plastic buckets for that purpose. *Id.*

Accordingly, for the similarities that Mr. Craft's case has with Mr. Bartel's, he submits that he should be sentenced similarly to avoid the risk of unwarranted sentence disparities.

### 7. Restitution.

The Government is not seeking restitution. *See* ECF 34.

## 8. Conclusion.

In sum, based on the foregoing and the letters of reference submitted for this Court's consideration, Mr. Craft moves this Honorable Court to vary downward from the advisory guidelines to impose a period of probation, or to impose a period of home detention as a condition of probation. *See* U.S.S.G. §§ 5B1.1(a)(2), 5C1.1(c)(3).

Supervision in the community is conducive to Mr. Craft's growth; imprisonment is not. Probation is a sentence that is "sufficient, but not greater than necessary" under the circumstances.

Date: December 29, 2021               Respectfully submitted.

*s/Ryan H. James*
Ryan H. James, Esq. (PA 313049)
1514 Lincoln Way, Ste. 301-302
White Oak, Pennsylvania 15131
412-977-1827
412-896-1321 (Fax)
ryan@rhjameslaw.com